**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| RAMONA ORELLANA, individually and on behalf of A.O., a minor, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: _____ |
| ROBLOX CORPORATION and APPLE INC., | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**<u>COMPLAINT</u>**

Plaintiffs Ramona Orellana, individually and on behalf of A.O., a minor, hereby file their *Complaint* against the Defendants Roblox Corporation and Apple Inc. (collectively, the "Defendants") notifying each Defendant of Plaintiffs' claims for relief as available under Florida law. In support thereof, Plaintiffs allege and state:

## I.   <u>NATURE OF THE ACTION</u>

1.     Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.     Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering stop interacting with friends and/or family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.      Video game addiction causes rifts between minors and young adults with gaming-

addiction and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.     Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.     Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.     The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, minor and young adult game players) addicted to the Defendants' video game products in order to maximize Defendants' profits.

7.     Defendants manufactured, published, marketed, and sold video games and gaming products, including those played by A.O., which Defendants had specifically developed and designed to cause the addiction experienced by A.O. and other users.

8.     Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.     Defendants rely on microtransactions to increase their profits from individual games.

10.     Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors, young adults, and neurodivergent individuals.

11.     Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12.     Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game products is their own bottom line.

13.     By making their games addictive, Defendants are able to maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game products and/or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

14.     "Microtransactions" often occur due to Defendants' use of patented technologies, algorithms, computer-generated "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times that player is subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

15.     By keeping minors, young adults, and neurodivergent users playing longer—and spending more money during gameplay and product usage—Defendants are causing physical and mental harm to users while consistently increasing their revenue.

16.     By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these product users age.

17.     Defendants are exploiting consumers, particularly minors, young adults, and neurodivergent users, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

18.     Video game addiction impacts thousands of product users and their families across the country, including in Florida.

19.     Plaintiffs are one of those families who have been negatively impacted by the addiction and harm caused by each of Defendants' video game products.

20.     Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused A.O.'s brain damage and gaming addiction, along with Plaintiffs' other damages as described herein.

21.     As a result of that gaming addiction and the harm caused by Defendants' products, A.O. specifically has experienced brain damage, severe emotional distress, diminished social interactions, loss of friends, poor hygiene, weight gain and withdrawal symptoms such as rage, anger, and physical outbursts.

22.     As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, A.O. will require treatment, including out-patient counseling, has dropped out of school and now requires home-schooling.

23.     As a result of A.O.'s gaming addiction and the harm proximately caused by Defendants' misconduct, Ramona Orellana has personally witnessed and been affected by A.O.'s gamer's rage and withdrawal symptoms. Ramona Orellana has personally experienced emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of Defendants' misconduct.

24.     Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Florida law.

## II.   PARTIES

25.    A.O., a minor, is and at all times relevant to this action, was a citizen and resident of the State of Florida with a principal place of residence located in Osceola County, Florida.

26.    A.O. is 11 years old at the time of filing of this lawsuit.

27.    A.O. began playing video games at four (4) years old.

28.    A.O. has continued to play video games at an increasing and uncontrollable pace since that time.

29.    A.O. has specifically played and continues to play Roblox.

30.    A.O. played and/or plays Roblox using an iPad or an iPhone.

31.    Plaintiff Ramona Orellana is, and at all times relevant to this action was, a citizen and resident of the State of Florida whose principal place of residence is in Osceola County, Florida.

32.    Ramona Orellana is the parent of A.O. and represents A.O.'s interests in this lawsuit.

33.    Ramona Orellana also seeks redress on Ramona Orellana's own behalf for loss of society and companionship, as well as for economic injuries and losses sustained as a result of A.O.'s brain damage and gaming addiction proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, and for actual damages and injuries Ramona Orellana personally sustained as a result of Defendants' deceptive, outrageous, fraudulent, and negligent acts.

34.    Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

35.     Roblox Corp. is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game, Roblox, either directly or indirectly, to members of the general public within the State of Florida,  including to Plaintiffs.

36.     Defendant Apple Inc. ("Apple") is a Delaware corporation with its principal place of business at One Apple Park Way, Cupertino, CA 95014.

37.     Apple is a foreign profit corporation authorized to do and does business in the State of Florida, and its registered agent and address for service of process is CT Corporation System located at 1200 South Pine Island Road, 200 E. Gaines St., Plantation, FL 33324.

38.     Apple acted in concert with Roblox Corp. to distribute, market, supply, and/or sell Roblox via Apple App Store and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, throughout the State of Florida, including Plaintiffs.

39.     At all times material hereto, each Defendant targeted consumers/purchasers, including minors, young adults, and neurodivergent individuals, to (1) purchase, play and/or use its video game products and (2) to purchase in-game items or perks in exchange for real money through in-game advertising and "fake" avatar friends.

40.     Each Defendant—with knowledge of A.O.'s age and Florida residency—targeted A.O. and induced A.O. to enter into microtransactions.

41.     Upon information and belief, each Defendant—with knowledge of A.O.'s age and Florida residency—allowed third parties to target A.O. and induce A.O. into microtransactions within Defendants' products.

### III. JURISDICTION AND VENUE

42. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of the *Complaint*.

43. This *Complaint* brings forth claims for relief arising under the laws of the State of Florida, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce, Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Florida that exceed the sum or value of $75,000, exclusive of interest and costs.

44. This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

45. This Court has personal jurisdiction over each Defendant because each routinely conducts business in Florida and has sufficient minimum contacts in Florida to have intentionally availed itself to this jurisdiction by marketing video game products and transacting business in the State of Florida.

46. At all relevant times, each Defendant was present and transacted, solicited, and substantially conducted business in the State of Florida through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

47. Defendants are conclusively presumed to have been doing business in this State and are subject to Florida's long arm jurisdiction.

48. At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Florida and throughout the United States.

49. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant

directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.   GENERAL ALLEGATIONS

### A. The Rise of Video Games

50.    A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

51.    Video games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

52.    A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

53.    Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control, manipulate, and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

54.    Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board.

55.    The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

56.    The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality gaming consoles.

57.     Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time which resulted in a long and slow method of earning profits.

58.     A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

59.     Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games that can take hundreds of hours to beat, there is a staggering amount of gameplay available to users in modern video games.

60.     The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

61.     The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

62.     In 2023, the video game industry's revenue was $365.6 billion globally.

63.     With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases.

64.     Most in-game purchases have been made by minors and young adults, including A.O.

65.     The explosive growth of the video game industry has been fueled by patented

"monetization schemes" that target minors and young adults who are induced to make several in-game purchases, or "microtransactions," of downloadable products.

66.     Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or of the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the safety of games.

67.     In order to entice minors and young adults to make such in-game purchases, video game product manufacturers, developers, and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money on microtransactions.

**B.  Microtransactions**

68.     Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

69.     The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game.

70.     Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

71.     Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

72.     Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

73.     While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

74.     Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

75.      In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

76.     Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

77.     Developers and publishers can also use microtransactions to lock potentially significant product upgrades and "easter eggs" designed to extend gameplay and increase a player's dopamine levels behind paywalls.

78.     Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

79.     The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

80.     This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

81.     This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

82.     Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

83.     For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

84.     Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

85.     Microtransactions are not only benefiting the gaming industry publishers and developers; the console manufacturers and suppliers-owners of online video game stores that allow the microtransactions in video games made available to consumers take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their products.

86.     While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

87.     Each Defendant knows this, or should be aware of this, because they have purposefully designed their video game products to be addictive and rely on microtransactions to make money from this vulnerable population.

## C. The Monetization Schemes Built into Video Games

88.     Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already

committed, both psychologically and financially.

89.     The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

90.     Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

91.     Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

    a.   The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

    b.   "Chasing": encouraging players to keep playing to get back any money they just lost;

    c.   "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

    d.   "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

    e.   "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

    f.   The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

92.     The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

93. Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

94. Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

95. Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

96. Games and video game products linked to a game player's social network pages also gather information about players and Defendants use this information to target products and microtransactions to users based on that player's unique interests and preferences.

97. As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

98. The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to

certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

99.     As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

100.     Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

101.     These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

102.     A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, rubber-banding, and pay-to-win models.

**i.  Loot Boxes**

103.     A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

104.     Through purchasing a loot box, the player acquires a seemingly random assortment of items.

105.     The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

106.    Loot boxes require no player skill and have a randomly determined outcome (*i.e.,* prize).

107.    Loot boxes are essentially a lottery that provide a way for gaming developers, publishers, suppliers, and even console manufacturers to increase revenue through underage gambling.

108.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

109.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

110.    Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

111.    Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

112.    Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

113.    Another example of a monetization scheme is "rubber-banding."

114.    Games have long employed rubber-banding to ensure dynamic difficulty, or a

consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

115.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

116.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

117.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

118.    Such technical sophistication in these purchasing systems aims to reduce the player's uncertainty or reluctance regarding purchasing decisions.

### iii. Pay-To-Win

119.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

120.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

121.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by ordinary, non-paying players.

122.    Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

**D.  Patents Target Minors to Increase In-Game Spending**

123.    Several video game manufacturers, developers, publishers, and suppliers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

124.    Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

125.    Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

a.  U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

b.  U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c.  U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies

the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e. U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f. U.S. Patent No. 8,702,523 B2, assigned to Microsoft Corporation ("Microsoft"), was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded

unless they purchase the full version of the game at that time." more specifically, with the patent:

    i. Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

    ii. The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g. U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h. U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the

patent in their video game design to stay connected with the user by requiring a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i.   U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.   U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes,

another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k. U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l. U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m. U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for

a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. more specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, and send selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

126.   There was once a time when such lopsided consumer video game monetization-related inventions would have been patent ineligible. However, because of the introduction of these

patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

127.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

128.    It is common practice for manufacturers, developers, publishers, and suppliers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E.  These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

129.    What players and parents, including Plaintiffs, often do not understand is that their gaming experience is not accidental, but rather carefully engineered by the game's manufacturers, designers, developers, publishers, and suppliers.

130.    In every game, there are several hundred, or maybe even thousands, of players who spend much more money in the game than the other players.

131.    Companies employ tactics specifically to attract heavy spending users—or "whales" or "VIPs."—and to induce them into spending even more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

132.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

133.    To target those who may be likely to spend additional money in the game, game manufacturers, developers, publishers, and suppliers, like Defendants, will monitor players and

collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

134.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

**F. Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted**

135.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new product content, and using tactics to ensure users are creating habits in their gameplay.

136.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

137.    For instance, Activision Blizzard, Inc. holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

138.    Upon information and belief, video game developers and publishers, including but not limited to Roblox Corp., and video game product suppliers and manufacturers, including but not limited to Apple, license this patented technology from Activision Blizzard, Inc., which allows the licensee, including both Defendants, to control users' experiences within the game.

---

[1]    *See* Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

139.    Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

140.    Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

141.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

142.    There are two kinds of feedback loops: positive and negative.

143.    Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

144.    Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

145.    Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

146.    By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

147.    A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

148.    When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

149.    In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players

playing longer.

150.    Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

151.    Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

152.    Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

153.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

154.    By constantly adding downloadable content or product upgrades to their video game products, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the game.

**G.  Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

155.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data.

156.    The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have

otherwise made.

157.    The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

158.    Research shows that "dark patterns" are highly effective at influencing consumer behavior.

159.    The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

160.    Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

161.    "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

162.    "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

163.    The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

164.    Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example,

online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

165.    Some dark patterns manipulate consumer choice by inducing false beliefs- such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

166.    Other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

167.    Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

168.    Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

169.    Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

170.    Microtransactions built into many video games by design are a form of drip-pricing.

171.    Each Defendant uses, or has used at relevant times, "dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

## H. Cloud Gaming Enhances Defendants' Predatory Activities

172.    Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

173.    Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

174.    Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

175.    Cloud gaming products allow users to stream any game available on the product at any time.

176.    Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

177.    This means players have easy access to hundreds or even thousands of games at one time.

178.    What's more, the catalogue of games available online through video game streaming is ever-changing and evolving.

179.    The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming product, by ensuring they always have something new and different to play.

**I.    Defendants' Predatory Schemes Created a Generation of Gaming Addicts**

180.    The feedback loops, other psychological properties, and cloud gaming products are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, online video game products, and predatory monetization schemes work together

to addict players to the games.

181.    During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

182.    In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

183.    Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

184.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

185.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

186.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative

---

[2] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[3] *Id.*

consequences.

187. The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

188. The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

189. Gaming disorder is the only behavioral addiction recognized in the DSM-5.

190. The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

191. Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

192. The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

193. For instance, IGD may be an impulse control disorder like compulsive gambling.

194. The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use

of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

195. These nine criteria are also outlined in the DSM-5.

196. Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

197. The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

198. The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

199. The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

200. The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

201. Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

202. The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

203. Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

204. These statistics are even higher for minors: 8.5% of youths aged between 8 and 18

suffer from gaming disorder.

205.    Comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J.  Effects of Video Games on Adolescent Brains**

206.    Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

207.    Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

208.    Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

209.    In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the United States.

210.    Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

211.    Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

212.    Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

213.    The prefrontal cortex—the locus of judgment, decision-making, and impulse

control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

214.   The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

215.   This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

216.   Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

217.   Brain activation studies have shown that videogame playing involved changes in

---

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

218.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

219.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

220.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

221.    Research has shown that a minor with a diagnosis of ADHD, autism, or oppositional defiant disorder ("ODD") is at a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

222.    Research has shown that while video games may foster creativity in children, such

---

[5] *Id.*

benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

223.     Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

224.     These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

225.     As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

226.     As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

227.     By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

**K.  The Harm: A.O.'s Addiction and Injuries, and Plaintiffs' Damages**

228.     A.O. is an 11-year-old individual addicted to and/or compulsively playing the Roblox video game.

229.     A.O. played and or plays Roblox using an iPad or an iPhone.

230.     Despite parental efforts to limit game time—efforts made astonishingly difficult, if not impossible, by the addictive design of Defendants' video game products and the absence of

parental controls within each Defendant's product (including but not limited to the absence of time-limit restrictions an inability to disable or limit Defendants' allowance of cross-sharing and cross-product play)—A.O. spends several hours per day using Defendants' products to play video games.

231.   A.O. generally spends over 10 hours per day playing Roblox.

232.   A.O. has spent thousands of hours, in total, using Defendants' products and playing video games.

233.   A.O. cannot refrain from gameplay and/or spending money while using Defendants' products.

234.   A.O. has spent large sums of money and/or used gift cards to purchase in-game transactions and downloadable products available in and accessible through Defendants' products.

235.   A.O. has experienced the following as a result of the brain damage, gaming addiction and harm caused by Defendants' products: severe emotional distress, diminished social interactions, loss of friends, poor hygiene, weight gain, and withdrawal symptoms such as rage, anger, and physical outbursts.

236.   As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, A.O. will require treatment, including out-patient counseling, has dropped out of school and now requires home-schooling

237.   Ramona Orellana has lost hope in the ability to control A.O.'s game playing time and worries about A.O.'s mental and physical condition when attempting to take games away from A.O.

238.   Ramona Orellana has experienced mental anguish, emotional distress, pain, suffering, and financial loss as a result of each Defendant's intentional, deceptive, fraudulent,

willful, immoral, reckless, and unlawful acts, as described herein---and is reasonably likely to continue to experience those injuries in the future due to the permanent impact of Defendants' wrongs on Plaintiffs.

239.    As a result of A.O.'s gaming addiction and the harm proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, Ramona Orellana has experienced loss of society and companionship—and has been financially damaged due to A.O.'s addiction and uncontrollable in-game spending.

**L.  Defendants' Conduct Specifically Led to Plaintiffs' Damages**

240.    Each Defendant is aware that its video game products are harmful to minors, young adults, and neurodivergent individuals because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

241.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

242.    Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that both Defendants are causing daily in the United States.

243.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiffs.

**M. Defendants' Products Used by A.O.**

**<u>Roblox</u>**

244.    Roblox is an online video game, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

245.    Roblox Corp.'s "mission" for Roblox is have a billion people actively using and

playing its game each day:



246.    Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; however, with the release of Roblox for play on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of people (particularly minors) grew exponentially.

247.    Roblox Corp. also saw an accelerated increase in the numbers of consumers downloading and playing Roblox as a result of the COVID-19 pandemic.

248.    As of August of 2020, Roblox had over 164 million monthly active users, with more than half of those users being American children under age 16.

249.    The numbers of consumers, particularly minors, using and playing Roblox continued to grow in 2023, when Roblox Corp. released versions of its Roblox product for play on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest Pro.

250.    Roblox Corp. markets Roblox as accessible on any device and, as of 2024, has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:

---

[6] https://corp.roblox.com/



251.    While Roblox Corp. has not released a version of Roblox for download and play on Nintendo Switch, Nintendo Switch users can access and play Roblox using the gaming console's built-in web browser.

252.    Currently, Roblox has over 66 million daily active users and over 217 million monthly active users, with more than 50% of consumers playing Roblox being under age 13.

253.    Roblox Corp. describes Roblox as an online, social gaming platform and game creation system that allows users to play games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio.

254.    Roblox Corp. designed the game-creation aspect of its product to allow players to create their own Roblox video games, as well as purchasable, one-time "game passes" and "developer products" microtransactions, for play and purchase by other Roblox users, including minors.

255.    Roblox Corp. designed the social-gaming aspect of its product to allow players to play Roblox games (or experiences) created by other users, which includes allowing players to buy, sell, and create virtual items, accessories, and limited-availability products for use in

---

[7] https://corp.roblox.com/

gameplay.

256.    Roblox is free to play; however, Roblox is designed to encourage in-game purchases and product upgrade microtransactions, which can be purchased using Robux, the game's virtual currency.

257.    Robux can be obtained (a) purchased with real currency; (b) received a part of a recurring stipend given to users with a Roblox Premium membership; and (c) earned from selling "game passes" or developer products" to other Roblox players.[8]

258.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

259.    For instance, corresponding with the increase of Roblox players due to the COVID-19 pandemic, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had been increased by 107% from its 2020, which had themselves been an 111% increase over 2019.

260.    Roblox Corp. specifically designed Roblox with certain addictive properties—at the risk of children's mental and physical health—to profit from product user's extended, long-term gameplay and corresponding in-game spending.

261.    Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their game includes the best psychological traits and technologies for player retention and addiction.

262.    Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, players can create games and maps for other users to try and play,

---

[8] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

making it a challenge in and of its own. Through research and product development, Roblox Corp. learned that when playing games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the game player's brain to seek these dopamine hits on a more regular or compulsive basis leading to abuse, addictive behavior, and video game addiction.

263.    Additionally, the variety within Roblox ensures that users are never bored and want to stop playing the game; there are always new challenges, maps, and characters to try, making the game feel like an ever-evolving entity that never stops providing entertainment.

264.    The ability for users to create their own games and challenges, combined with users' ability to spend real-world funds to change their avatar's image and abilities, makes sure that the gaming experience is different for players each time they log in.

265.    Such constant variety keeps players "hooked," or coming back daily and playing for hours.

266.    Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

267.    Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted and incompetent users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

268.    Roblox Corp. does not adequately inform users of the inherent risks involved with

using and playing Roblox or that the game was designed to addict and harm users

269.    Though it is equipped with the knowledge of the addictive risks inherent in its game, Roblox Corp. has failed to inform the public, users, or parents of such risks.

270.    Roblox Corp. describes its game as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[9]

271.    Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



272.    While marketing its video game as an educational tool to benefit minors and neurodivergent individuals, Roblox Corp. does not disclose the psychology and addictive characteristics behind Roblox's design or that Roblox contains numerous addictive principles that are negatively impacting minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

**Apple App Store**

273.    Through the Apple App Store, Apple provides a platform for users to download certain games and play them on Android mobile devices.

---

[9] https://corporate.roblox.com/faq/
[10] https://education.roblox.com/

274.   Roblox is available in the Apple App Store.

275.   Once a gaming app is downloaded, Apple provides a framework for "in-app billing" to initiate and process transactions.

276.   This framework enables game developers to sell microtransactions and/or loot boxes through the Apple platform.

277.   In exchange, Apple takes 30% of all revenue generated by these microtransactions and in-app purchases.

278.   Apple does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

279.   Instead, Apple specifically designed this platform to attract users to purchase games and in-game content therein—regardless of the harmful content such games may include.

280.   Apple hires behavioral psychologists and neuroscientists to design its platform and marketing in the best way possible to attract users, especially minors and young adults.

281.   Apple is aware that several of the games on its platform that it sells and encourages users to purchase continuous in-game content are addictive and pose unreasonable risk of harm to users, particularly minors.

**N.  Minors' Access to Defendants' Products**

282.   Defendants market their gaming products, including Roblox and the Apple App Store and their respective in-product transactions and complementary online subscription products to minors, young adults, and neurodivergent individuals.

283.   A.O. is a minor and, therefore, is such a person to whom Defendants directed their marketing efforts and to whom Defendants sold their gaming products.

284.     A.O.—as a minor—lacked the capacity to contract, and thus Plaintiffs expressly disaffirm any contract A.O. may have made with any of the Defendants, or that Defendants may claim A.O. made with them before reaching the age of majority.

285.     A.O.'s continued use of Defendants' products is compulsive and due to addiction and in no way was an affirmation of any contract.

286.     After consumers purchase Defendants' gaming products, Defendants condition users' access to their gaming products on accepting terms and conditions—and failure by users to accept and to continue to accept any new terms and conditions results in a loss of access to the purchased product. Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

287.     Defendants' products were designed to addict A.O. to the products, which proximately caused A.O.'s mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a minor.

### V.     TOLLING OF STATUTE OF LIMITATIONS

288.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

289.     Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

290.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

291.    Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

292.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

293.    Defendants' fraudulent concealment has tolled the running of any statute of limitations.

294.    Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

295.    Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

296.    Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

297.    Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

298.    Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

299.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.   <u>CAUSES OF ACTION</u>

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
#### (Against Both Defendants)

300.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

301.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and/or otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

302.    Each Defendant's video game products is designed as, and intended to be used for, video gameplay by end-users/consumers of all ages, including minors and young adults, throughout the world, including in Florida.

303.    Each Defendant markets and advertises their video game products, in Florida and throughout the United States, for personal use and video gameplay by end-users/consumers of all ages, including minors and young adults.

304.    Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to, and did not, appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

a. Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products; and

b. Apple designed the Apple App Store as a platform to house addictive gaming products and to push users to make purchases of addictive materials on the platform.

305.    The defects in the design of each Defendant's respective gaming products existed prior to the release of these products to A.O. and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to A.O. via download or URL access (in regard to digital game copies and cloud gaming).

306.    A.O. used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that A.O. would use these products without Plaintiffs inspecting them for and/or being unable to discover their addictive nature.

307.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, and/or neurodivergent user) to create and cause addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

a. Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

      b.   Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

308.   Each Defendant's respective products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

309.   Youth, including A.O., and young adults are among the ordinary consumers of each Defendant's products.

310.   Minors and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

311.   Each Defendant's respective products are likewise defectively designed such that it creates an inherent and unreasonable risk of danger; specifically, a risk of brain damage in and abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals leading to a cascade of harms. Those harms include, but are not limited to, dissociative behavior,

withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

312.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including A.O., who used the products without any substantial change in the products' condition.

313.    The risks inherent in the design of each Defendant's respective products significantly outweigh any benefit of such design.

314.    Each Defendant could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

> a.    Choosing not to use "addictive" patents identified herein in the game design;
>
> b.    Redesigning gaming software to limit rather than promote addictive engagement;
>
> c.    Implementing robust age verification;
>
> d.    Implementing effective parental controls;
>
> e.    Implementing effective parental notifications;
>
> f.    Warning of health effects of use and extended use upon sign-up or log-in;
>
> g.    Implementing default protective limits to the length and frequency of gaming sessions;
>
> h.    Implementing opt-in restrictions to the length and frequency of gaming sessions;

i.  Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j.  Implementing blocks to use during certain times of day (such as during school hours or late at night);

k.  Implementing limits on number of games playable per day;

l.  Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.  Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n.  Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.  Others as set forth herein.

315.   Alternative designs were available that would reduce neurodivergent users, young adults, and minors' addictive and compulsive engagement with each Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

316.   A.O. used Defendants' products as intended and/or in reasonably foreseeable ways.

317.   As a direct and proximate result of their use of Defendants' defectively designed products, A.O. sustained physical and mental injuries, emotional distress, pain, suffering, mental anguish, and economic injuries and damages.

318.   A.O.'s injuries and damages were reasonably foreseeable to each Defendant at the time of their respective products' development, design, advertising, marketing, promotion, and

distribution, especially considering each Defendant's conduct—described herein and including, but not limited to, specifically designing their video game products to be addictive.

319.    The defective design of the video game products used by A.O., including Roblox and the Apple App Store was a substantial factor in causing harm to A.O.

320.    As a direct and proximate result of Defendants' respective products' defective design, A.O. became addicted to Roblox and sustained brain damage, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain, suffering, and mental anguish.

321.    A.O. was injured as a direct and proximate result of each Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

322.    The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to A.O.

323.    Plaintiffs' damages, which were proximately caused by Defendants' defective design, are A.O.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; A.O.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to A.O.'s physical and mental injuries. A.O.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

324.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

325.     Each Defendant, in defectively designing their video game products, acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

326.     The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

327.     The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, A.O. continues to use Defendants' respective products. While A.O. uses Defendants' respective products, Plaintiffs will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

**COUNT II**
**STRICT LIABILITY – FAILURE TO WARN**
**(Against Both Defendants)**

328.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

329.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

330.     Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public, in Florida and throughout the United States, for the personal use of the end-user/consumer.

331.     Each Defendant's respective products are also marketed and advertised to minors, young adults, and neurodivergent individuals in Florida and throughout the United States.

332.     None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

333.     None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

334.     Each Defendants sold and distributed its respective products to A.O. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

335.     Each Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use.

336.     Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth, young adults, and neurodivergent users

considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

337.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a.    Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.    Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c.    The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d.    New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.    The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.    The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented

technology and code design, some of which is currently publicly unknown and hidden from users.

338.   Ordinary users could not and/or would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each Defendants.

339.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control without reasonable instructions and/or warnings regarding the harm outlined herein.

340.   Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

341.   Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

342.   Each Defendant, in failing to warn consumers and end-users that their video game products were addictive and have a risk of harm (including but not limited to brain damage), acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

343.   As a direct and proximate result of each Defendant's failure to warn, A.O. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

344.     Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

345.     Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

346.     The nature of the fraudulent and unlawful acts that created safety concerns for A.O. are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, A.O. continues to use Defendants' respective products. When A.O. uses Defendants' respective products, Plaintiffs will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

### COUNT III
### NEGLIGENCE – DESIGN
### (Against Both Defendants)

347.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

348.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

349.     Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

350.    Each Defendant's respective products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

351.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth, young adults, and neurodivergent individuals in a reasonably foreseeable manner. This knowledge includes, but is not limited to:

      a.  Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

      b.  Apple designed the Apple App Store as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

352.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth, young adults, and neurodivergent individuals. These risks were known and knowable in light of each Defendant's own internal

information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to A.O.

353.    Each Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include brain damage, abuse, addiction, and compulsive use in youth, young adults, and neurodivergent individuals, and which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

354.    Each Defendant knew that minors, young adults, and neurodivergent individuals would use its respective products.

355.    Despite this knowledge, each Defendant designed its video game products to create addictive engagement and compulsive use, including spending, in foreseeable users, including Plaintiffs.

356.    Each Defendant, as video game product designer, manufacturer, publisher, importer, distributor, and/or supplier, had a duty to design, manufacture, and supply a product that is reasonably safe for use.

357.    Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

358.    Each Defendant owed a duty to design, publish, supply, and sell reasonably safe products to foreseeable users, including A.O.

359.    Each Defendant owed these duties to Plaintiffs, and particularly to A.O. as the foreseeable end-user.

360.    Each Defendant breached the duties owed to Plaintiffs, and particularly to A.O. These breaches include, but are not limited to:

    a.  Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

    b.  Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

    c.  Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

    d.  Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

    e.  Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    f.  Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features

described above, and other safety measures, to minimize the harms described herein; and

g.  Otherwise failing to use ordinary care in the design of the products.

361.    Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have effectively served the same purpose as each Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors, young adults, and neurodivergent individuals, including the danger and harm experienced by A.O.

362.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

363.    At the time each Defendants put its products into the market in Florida and throughout the United States, the products were defective as outlined herein, and at the time A.O. received and used each Defendant's products, the products remained defective.

364.    At all relevant times, A.O. used Defendants' respective products in the manner in which they were intended by Defendants to be used.

365.    As a direct and proximate result of each Defendant's breached duties, Plaintiffs were harmed.

366.    Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

367.    As a direct and proximate result of each Defendant's breached duties, A.O. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

368.     As a direct and proximate result of each Defendant's breached duties, Plaintiffs have suffered—and continue to suffer—economic loss and damages, as described herein.

369.     Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

**COUNT IV**
**NEGLIGENCE – FAILURE TO WARN**
**(Against Both Defendants)**

370.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

371.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

372.     Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

373.     Each Defendant's respective products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

374.     Each Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth, young adults, and neurodivergent individuals. More specifically, Defendants knowledge includes but is not limited to:

      a.  Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or

neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

b.  Apple designed the Apple App Store as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

375.   Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to A.O.

376.   Each Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as A.O. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

377. Each Defendant knew that minors, including A.O., would use its respective products.

378. Defendants failed to give appropriate warnings about the risks of their products. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

379. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

380. Had Plaintiffs received proper or adequate warnings about the risks of Defendants' respective products, Plaintiffs would have heeded such warnings.

381. Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

382. Each Defendant had a duty to warn and/or instruct about particular risks of their video game products, both before and after leaving a Defendant's possession.

383. Each Defendant owed these duties to users including A.O.

384. Each Defendant breached the duties owed to A.O., a foreseeable user. These breaches include, but are not limited to:

    a.    Failing to warn users that Defendants' respective products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.    Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product;

c.    Failing to adequately instruct Plaintiffs regarding the risks of each Defendant's respective products and the need to alter A.O.'s game play to avoid such risks; and

d.    Otherwise failing to warn and/or instruct product users, including Plaintiffs, of the risk and harm associated with normal, foreseeable, and intended use of Defendants' video game products.

385.    A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

386.    At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein but failed to do so.

387.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have heeded such warnings.

388.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

389.    Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and

Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

**COUNT V**
**NEGLIGENCE - ORDINARY**
**(Against Both Defendants)**

390.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

391.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

392.    Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public in Florida and throughout the United States for the personal use of the end-user/consumer.

393.    Each Defendant's respective products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

394.    Each Defendant owed A.O. a duty to act as a reasonably careful company would under the circumstances.

395.    Each Defendant has breached the duties owed to A.O.

396.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

397.    A reasonably careful company would protect A.O. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

398.    A reasonably careful company would not invite, encourage, or facilitate youth, such as A.O., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

399.    A reasonably careful company would disclose the serious safety risks presented by its respective products; yet each Defendant failed to do so. More specifically:

   a.   Roblox Corp. failed to disclose it designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

   b.   Apple failed to disclose that it designed the Apple App Store as a platform to house and push addictive content to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

400.    A.O. was a foreseeable user of the Defendants' respective products.

401.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of A.O.'s use of Defendants' respective products.

402.    Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed,

maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as A.O. in a reasonably foreseeable manner. More specifically:

a. Roblox Corp. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

a. Apple designed the Apple App Store as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

403.    Each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

404.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as

A.O., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

405.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as A.O., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

406.    Each Defendant's conduct was closely connected to A.O.'s injuries and Plaintiffs' damages, which were highly certain to occur.

407.    Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed A.O.

408.    Each Defendant's failure to act as a reasonable company would under similar circumstances harmed Plaintiffs.

409.    A reasonable company engaged in the manufacture, design, development, and supply of video game products to minors would comply with applicable federal and state laws designed to protect children; yet, Defendants did not do that.

410.    Each Defendant is required to comply with the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, and the corresponding federal regulations, 16 C.F.R. § 312 *et seq.*

411.    COPPA protects minors who use the internet and requires each Defendant to utilize a heightened duty of care for users under the age of 13 due to the recognized safety risks pose to

such users from interactive online products like Defendants' respective gaming products. *See, e.g.,* 16 C.F.R. §§ 312.4, 312.5.

412.    Each Defendants collects or uses personal information from children under the age of 13—including A.O.—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

413.    Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's image, biometric and health information, and geolocations, directly from users of its respective websites or online services.

414.    Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

415.    As described above, each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

   a.   Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

   b.   Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their websites and applications so that parents or guardians could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c.  Failing to obtain verifiable parental or guardian consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

416.  Roblox Corp., in connection with its Roblox online game platform and game creation system, violated COPPA and those violations include, but are not limited to:

a.  Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

b.  Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily;

c.  Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

d.  Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

417.  Apple, in connection with its Apple Store App violated COPPA and those violations include, but are not limited to:

a.  Employing dark patterns in children's gaming apps, including Roblox. These dark patterns include, but are not limited to, tricking someone into paying for

goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges;

b.   Using dark patterns to entice minors, including A.O., into microtransactions without parental consent or consent of the account holder, including but not limited to attracting and enticing minors into microtransactions based on the minor-player's gaming behavior and their personal data (e.g., IP addresses, geolocation, voice) that is illegally collected, not deleted, or gained through passive tracking applications; and

c.   Collecting and retaining children's voice and audio information.

418.   Apple's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors—including A.O.—and to design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

419.   Each Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or unknowingly make in-game purchases using the game patens and other illegal dark patterns.

420.   Likewise, each Defendant had a duty to comply with Fla. Stat. § 501.1735, which states platforms that provide an online service, product, game, or feature, like Defendants' gaming products, likely to be predominantly accessed by children, like A.O., may not:

a.   Process the personal information of any child if the online platform has actual knowledge of or willfully disregards that the processing may result in substantial harm or privacy risk to children;

b.   Profile a child unless both of the following criteria are met:

    i.   the online platform can demonstrate it has appropriate safeguards in place to protect children, and

    ii.   (a) profiling is necessary to provide the online service, product, or feature requested for the aspects of the online service, product or feature with which the child is actively and knowingly engaged; or (b) the online platform can demonstrate a compelling reason that profiling does not pose a substantial harm or privacy risk to children;

c.   Collect, sell, share, or retain any personal information that is not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged unless the online platform can demonstrate a compelling reason that collecting, selling, sharing, or retaining the personal information does not pose a substantial harm or privacy risk to children;

d.   Use personal information of a child for any reason other than the reason for which the personal information was collected, unless the online platform can demonstrate a compelling reason that the use of the personal information does not pose a substantial harm or privacy risk to children;

e.   Collect, sell, or share any precise geolocation data of children unless the collection of the precise geolocation data is strictly necessary for the online platform to provide the service, product, or feature requested and then only for

the limited time that the collection of the precise geolocation data is necessary to provide the service, product, or feature;.

    f.   Collect any precise geolocation data of a child without providing an obvious sign to the child for the duration of the collection that the precise geolocation data is being collected;

    g.   Use dark patterns to lead or encourage children to provide personal information beyond what personal information would otherwise be reasonably expected to be provided for that online service, product, game, or feature; to forego privacy protections; or to take any action that the online platform has actual knowledge of or willfully disregards that may result in substantial harm or privacy risk to children; and

    h.   Use any personal information collected to estimate age or age range for any other purpose or retain that personal information longer than necessary to estimate age. The age estimate must be proportionate to the risks and data practice of an online service, product, or feature.

421.   Each Defendant violated Fla. Stat. § 501.1735 as outlined herein, including but not limited to:

    a.   Profiling children in order to prey on the minors and trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns and/or to knowingly target minors to addict them to Defendants' products so Defendants can increase profits as much as possible;

b.  Processing children's information with a willful disregard for the harms outlined herein; and

c.  Collecting and retaining information not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged posing an unnecessary and unreasonable risk of harm to children.

422.  Each Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each Defendants, or that each Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

423.  Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.  Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including A.O.;

b.  Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including A.O., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including A.O.;

d.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including A.O.;

e.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including A.O., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including A.O.;

g.  Developing, patenting, and licensing unreasonably dangerous features and algorithms for video game products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, like A.O.;

h.  Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and

operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users; and

i.   Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

424.   Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.   Failing to implement effective protocols to block users under the age of 13;

b.   Failing to implement effective parental controls;

c.   Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.   Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content, product upgrades, and/or microtransactions;

e.   Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.   Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

425.     Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

426.     A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like A.O.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

427.     As a direct and proximate result of each Defendant's breach of one or more of its duties, A.O. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

428.     As alleged herein, each Defendant's breach of one or more of its duties is a proximate cause of A.O.'s injuries and the damages sustained by Plaintiffs.

429.     As a direct and proximate result of each Defendant's breach of duties, A.O. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

430.     Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT VI**
**GROSS NEGLIGENCE**
**(Against Both Defendants)**

431.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

432.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

433.    Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public in Florida and throughout the United States for the personal use of the end-user/consumer.

434.    Each Defendant's respective products are also marketed and advertised to young adults and minors, including A.O.

435.    Each Defendant owed A.O. a duty to act as a reasonably careful company would under the circumstances.

436.    A reasonably careful company would not create an imminent and/or clear and present danger from and in the use of its products (including an imminent risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

437.    A reasonably careful company would protect A.O. from imminent and/or a clear and present danger from and in the use of its products; yet each Defendant failed to do that.

438.    A reasonably careful company would not invite, encourage, or facilitate youth, including A.O., to engage in dangerous behavior through or as a reasonably foreseeable result of

using its products; yet each Defendant did just that.

439.    A reasonably careful company would disclose the serious safety risks presented by its respective products; yet each Defendant failed to do that. More specifically:

a.   Roblox Corp. failed to disclose that it designed Roblox with addictive properties, including but not limited to using technologies, algorithms, and psychological tricks within the game to keep users playing and engaged with Roblox, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm; and

b.   Apple failed to disclose that it designed the Apple App Store as a platform to house and push addictive content to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

440.    A.O. was a foreseeable user of each Defendant's respective products.

441.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of A.O.'s use of each Defendant's respective products.

442.    Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) created an imminent risk and/or clear and present danger when used by youth, including A.O., in a reasonably foreseeable manner. More specifically:

a.   Roblox Corp. designed Roblox to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create

addictive engagement, while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm; and

b. Apple designed the Apple App Store as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

443.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed imminent and/or clear and present danger to youth, including A.O., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

444.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, including A.O., would not have realized the dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

445.    Each Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the

risk of using Defendants' respective products that were known to each Defendants, or that each Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

446.    Each Defendant designed, developed, managed, operated, tested, produced, manufactured, labeled, marketed, advertised, promoted, controlled, supplied, leased, sold, and/or otherwise distributed its products, which Defendants knew or should have known posed imminent and/or clear and present danger, throughout Florida and the United States with a conscious disregard of the consequences described herein.

447.    Each Defendant's conduct was closely connected to Plaintiffs' injuries and damages, which were highly certain to occur.

448.    Each Defendant could have avoided Plaintiffs' injuries and damages with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed A.O.

449.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.; Florida COPPA Statute.*

450.    Each Defendant failed to use even slight diligence in fulfilling the duties owed to Plaintiffs.

451.    Accordingly, each Defendant has grossly breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.   Including features and patented technology in their respective products that, as

described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including A.O.;

b. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including A.O., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including A.O.;

d. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including A.O.; and

e. Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

452. Each Defendant has grossly breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its

respective products. Those breaches include:

   a.   Failing to implement effective protocols to block users under the age of 13;

   b.   Failing to implement effective parental controls;

   c.   Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

   d.   Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

   e.   Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

   f.   Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

453.   Each Defendant further grossly breached the duty owed to Plaintiffs by failing to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.; FL COPPA statute.*

454.   A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and protective of youth users including A.O.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

455.   As a direct and proximate result of each Defendant's gross breach of one or more

of its duties, A.O. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

456.    Each Defendant's breach of one or more of its duties proximately caused Plaintiffs' injuries and damages.

457.    Each Defendant's breach, or negligent act, as described and identified herein, was done with knowledge that Defendants' video game products (including those identified herein and used by A.O.) posed imminent, clear, and real danger to foreseeable users of those video game products (including A.O.).

458.    As a direct and proximate result of each Defendant's course of conduct and breach of duties, A.O. has been gravely injured, and has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

459.    Each Defendant was grossly negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Both Defendants)

460.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

461.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

462.    Defendants outrageous, extreme, and reckless conduct, as described herein, caused Ramona Orellana and A.O. to experience extreme emotional distress; and that misconduct includes but is not limited to:

    a.    Each Defendants intentionally designed its respective products to addict minor, young adult, and neurodivergent users, the type of individuals who were particularly unable to appreciate the risks posed by Defendants' products and were particularly susceptible to harms from those products.

    b.    Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products; and

    c.    Apple designed the Apple App Store as a platform to house addictive gaming products and pushed users to make purchases through the platform;

    d.    Each Defendant intentionally designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

    e.    Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

f.   Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content;

g.   Each Defendant intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like A.O., to use each Defendants' respective product and intended for users, like A.O., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics;

h.   Each Defendant knew that extended use of video games, *i.e.,* their products, could likely cause addiction, yet each Defendant engaged in the course of conduct and reckless behavior surrounding their video game products;

i.   Each Defendant intentionally failed to warn users, prospective users, or their parents/guardians of the addictive components of its video game products and gaming products; and

j.   Each Defendant displayed flagrant disregard and an entire want of care to the consequences of their conduct, including to the health, safety, and welfare of their customers.

463.   Each Defendant's conduct in designing and developing its products to knowingly and purposefully addict and harm users—especially minors, young adults, and neurodivergent individuals—was intentional, reckless, extreme, and outrageous, and was beyond all possible

bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

464.    Each Defendant knew users, like A.O., would likely become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off users, including A.O., after initial purchase or download.

465.    Each Defendant knew that when users, like A.O., became addicted to Defendants' respective products due to the addictive and defective qualities thereof, that parents and families, like Plaintiffs, would be forced to deal with an uncontrollable video game addiction in their child and the harmful effects of such addiction.

466.    Each Defendant intended to inflict emotional distress (*e.g.*, causing addiction) on users, like A.O., and should have known product users and their families, like Plaintiffs, would suffer emotional distress as a result of Defendants' conduct.

467.    Plaintiffs have sustained severe emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

468.    Further, A.O.'s family has endured A.O.'s bouts of gamer's rage and emotional disturbances which will require out-patient counseling, private tutoring and/or home-schooling.

469.    Defendants' conduct—individually and collectively—including their decision to intentionally create and market products that addict and abuse children and cause them severe mental and physical harm and distress—is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

470.    No reasonable person would be expected to endure such severe emotional distress as each Defendant has caused Plaintiffs.

471.    As a direct and proximate result of each Defendants' outrageous conduct and infliction of emotional distress, A.O. has experienced extreme emotional distress and will require additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

472.    As a direct and proximate result of each Defendants' outrageous conduct and infliction of emotional distress, Ramona Orellana has experienced severe emotional distress that has resulted in pain, suffering, and mental anguish, including having to witness A.O. suffer from addiction, pain, and mental distress caused by Defendants' outrageous conduct.

473.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

## COUNT VIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against Both Defendants)
### (Pleaded in the Alternative)

474.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

475.    Plaintiffs plead this in the alternative.

476.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and otherwise distributing the

video game products used by A.O.: Roblox and the Apple App Store.

477.    Each Defendant owed A.O. a duty to act as a reasonably careful company under the circumstances and not cause severe emotional distress to foreseeable users; yet each Defendant did just that.

478.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant defectively designed its respective products to addict minors, young adults and neurodivergent individuals who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products. Specifically,

   a.    Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products; and

   b.    Apple designed the Apple App Store as a platform to house addictive gaming products and pushed users to make purchases through the platform.

479.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users including A.O.) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

   a.    Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users; and

b.   Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

480.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of A.O.'s use of Defendants' respective products.

481.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including A.O., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

482.   Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users, including A.O., of its respective products, including A.O., would not and could not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

483.   A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users, including A.O.; yet Defendants did not do this and caused Plaintiffs to experience severe emotional distress and psychological trauma.

484.   A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just

that and caused Plaintiffs to experience severe emotional distress and psychological trauma.

485.    A reasonably careful company would protect A.O. from unreasonable risk of injury from and in the use of its products, and the emotional distress likely to result therefrom; yet each Defendant failed to do that and caused Plaintiffs to experience severe emotional distress and psychological trauma.

486.    A reasonably careful company would not invite, encourage, or facilitate youth, young adults, and neurodivergent individuals, including A.O., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products, and that such foreseeable users would experience severe emotional distress as a result of that designed-addictive behavior; yet each Defendant did just that and caused Plaintiffs to experience severe emotional distress and psychological trauma..

487.    A reasonably careful company would disclose the serious safety risks presented by its respective products and that those safety risks included psychological trauma; yet each Defendant failed to disclose such risks and caused Plaintiffs to experience severe emotional distress and psychological trauma.

488.    Each Defendant has breached the duties owed to A.O. and caused Plaintiffs to endure psychological trauma.

489.    Defendants' products, including Roblox are psychologically and neurologically addictive when used in their intended manner by their intended audience; and Defendants reasonably should have known that when used as intended by minors, young adults, and neurodivergent individuals, including A.O., to use each Defendants' respective product and for users, including A.O., to become addicted to the product, or should have known that users (particularly minors, young adults, and neurodivergent individuals) would become addicted and

experience emotional and physical injuries, including severe emotional distress, as a result of Defendants' conduct and immoral tactics.

490.    Each Defendant knew, or should have known, that users, including A.O., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and made them addictive to these vulnerable consumers so Defendants can continue to profit off of users, including A.O., after initial purchase or download.

491.    Each Defendant knew, or should have known, that the harm caused to foreseeable users of Defendants' video game products, including the harm caused to minors, young adults, and neurodivergent individuals and experienced by A.O., would cause severe emotional distress to those in close personal relationship to the harmed user, including parents like Ramona Orellana.

492.    Each Defendant's conduct was closely connected to Plaintiffs' emotional distress, which was highly certain to occur.

493.    As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

494.    As a direct and proximate result of each Defendants' negligent conduct and infliction of emotional distress, A.O. has experienced extreme emotional distress, including diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts.

495.    and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

496.    As a direct and proximate result of each Defendants' negligent conduct and

inflction of emotional distress, Ramona Orellana has experienced extreme emotional, including a fractured parent-child relationship, and loss of parenting role.

497.   As a direct and proximate result of each Defendant's negligent inflction of emotional distress, Plaintiffs have been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

498.   Each Defendant negligently caused Plaintiffs to experience emotional distress and psychological trauma, such that Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT IX
## FRAUDULENT MISREPRESENTATION
### (Against Both Defendants)

499.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

500.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by A.O.: Roblox and the Apple App Store.

501.   As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

502.   Each Defendant knew their video game products posed risk to minors, like A.O., based on internal research and external studies known in the industry and to each Defendant; yet

each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like A.O., to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

503.    Each Defendant could have disclosed the defective condition of their video game products to the public and could have advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

504.    Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its respective products.

505.    Each Defendant intentionally omitted or knowingly did not disclose material facts about their respective products, or their collective use of patents designed to addict players to Defendants' products. For instance,

     a.  Roblox Corp. did not inform the public that it designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury; and

     b.  Apple did not inform the public that it designed its Apple Store App with addictive features, or that these products could be used to download addictive games and content, despite knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury.

506.    Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

a. Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs; and

b. Apple designed its Apple Store App with addictive features and for use with addictive video game products, and designed its Apple Store App as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs.

507.   Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including A.O., to continue using its respective products and avoid losing users and revenue.

508.   Each Defendant knew that its concealment was material.

509.   Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

510.   In addition to hiding and concealing the dangers of their video game products, each Defendant made material misrepresentations (and others) about their respective products while

knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

511.    Defendants' false representations involve, but are not limited to, material misstatements about the safety of Defendants' video game products:

    a.    Roblox Corp. misrepresented Roblox as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Roblox poses significant risk of harm to users; and

    b.    Apple misrepresented that its Apple App Store was safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users, like A.O., purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like A.O..

512.    Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

    a.    Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof, despite knowing that Roblox

contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by A.O.; and

b. Apple knew that its Apple Store App platform, as well as Roblox, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed its platform for play by youth and directed its misstatements towards users of Roblox, Minecraft, and other games designed, developed and utilizing the patents and technology described herein.

513.    Each Defendant knew that its acts of concealment and omissions, nondisclosures, and misrepresentations involved material information.

514.    Defendants' omission, nondisclosures, and misrepresentations were material because a reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

515.    If Defendants had not concealed, omitted, and misrepresented material facts regarding the safety of their products, Ramona Orellana would not have allowed A.O. to use Defendants' video game products and would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or content upgrades or in-game transactions in each Defendant's product.

516.    As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

517.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

518.    As a direct and proximate result of each Defendant's concealment, omission, nondisclosures, and misrepresentation of material information, A.O. has been injured and Plaintiffs have sustained damages, as described herein.

519.    Each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

520.    Defendants' fraudulent concealment tolls any applicable statute of limitations.

521.    At all relevant times, within their respective video game products, each Defendant included the ability for users, including Plaintiffs, to purchase in-game downloadable products or microtransactions; yet each Defendant hid the risk of harm posed by those products and that each Defendant used patented technologies and psychological features to target users based on their use of the product and other interactions with Defendants' products.

522.    Users of Defendants' products, including minors, young adults, and neurodivergent individuals such as A.O., were deceived by each Defendant in connection with these

microtransactions through false representations and material misstatements built into each Defendants' products.

523.   Defendants' methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like A.O., that game-selected purchases would help them advance in the game or complete necessary missions.

524.   Defendants made these false representations and material nondisclosures with intent that product users, like A.O., spend money on microtransactions.

525.   At the time each Defendant utilized these technologies to deceive A.O., and each Defendant knew that the representations made through the game were false and existed only to entice A.O. to continue spending.

526.   Each Defendant intended its fraudulent in-game microtransactions and psychological tactics to take advantage of users like A.O.

527.   At the same time, each Defendant knew that misrepresentations served only to increase users'—including A.O.'s—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

528.   A.O. reasonably relied on Defendants' misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value to A.O. within the game.

529.    Had Plaintiffs known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, and the result of Defendants' use of patented technologies, A.O. never would have purchased Defendants' video game products or spent money on additional in-game downloadable content or microtransactions built into the product design.

530.    Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

531.    Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like A.O., would continue using each Defendant's respective products.

532.    Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing their video game products were safe or even beneficial for children to use.

533.    Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

534.    By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product..

535.   Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like A.O., would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

536.   A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

537.   As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

538.   As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each Defendant's inducements to utilize their products, download and play their games, and/or continuously spend funds through its products.

539.   By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe,

each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

540.   Each Defendant knew that its misstatements and false representations, as identified herein, were material.

541.   The misrepresentations described herein were made to Plaintiffs—particularly to A.O.—prior to their purchase of each Defendant's product and to A.O. while A.O. was using Defendants' products as intended.

542.   Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

543.   Plaintiffs relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Roblox and the Apple Store App.

544.   Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or downloadable game content upgrades or in-game transactions in each Defendant's product was justifiable and reasonable under the circumstances.

545.   As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

546.     As a direct and proximate result of each Defendant's material misrepresentations and false statements (*e.g.,* Defendants' deceit), Plaintiffs have been damaged. Such damage includes A.O.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; A.O.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to A.O.'s physical and mental injuries. A.O.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

547.     Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

548.     In conjunction with Defendants' acts of concealment, omission, nondisclosure, and misrepresentation, each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

## COUNT X
## NEGLIGENT MISREPRESENTATION
### (Against Both Defendants)

549.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

550.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by A.O.: Roblox and the Apple App Store.

551.    Each Defendant had a pecuniary interest in the video game products used by A.O.

552.    Each Defendant—and all designers, developers, manufacturers, publishers, and suppliers of video gaming products having a pecuniary interest in these video game products— had a duty to communicate accurate information and to make truthful statements of material fact to the public about their video game products. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of Defendants' products used by A.O. and that those products posed serious health risks to users, particularly youth, young adults, and neurodivergent individuals.

553.    As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors, including A.O.; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use:

> a. Roblox Corp. misrepresented Roblox as safe for use by minors and young adults, even marketing the games as "educational" and safe for use by all, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury; and

      b.   Apple misrepresented its Apple App Store platforms as safe for use by minors and young adults, even marketing the platforms toward youth, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury.

554.    Each Defendant made these false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

555.    Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

556.    Defendants' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use Defendants' products—and Ramona Orellana relied upon Defendants' false statements and misrepresentations in allowing A.O. to use Defendants' games and gaming products, Likewise, A.O. relied on Defendants' false statements and misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms, including the use of fake "friends" to induce A.O. into spending money.

557.    Plaintiffs' reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

558.    Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and

harms to Plaintiffs, described above, including but not limited to A.O.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each Defendant's material misrepresentations, A.O. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

559.    Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

**COUNT XI**
**CIVIL CONSPIRACY**
**(Against Both Defendants)**

560.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

561.    A civil conspiracy occurs when two or more persons with an unlawful objective, after a meeting of the minds, commit at least one act in furtherance of the conspiracy and thereby damage another. Such a conspiracy occurred here.

562.    Defendants conspired to addict users, including A.O., to Defendants' gaming products.

563.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like A.O., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products

to cause and that was experienced by A.O. and other users.

564.   Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each Defendants to utilize the same patents to keep users, including minors like A.O., addicted to Defendants' products.

565.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like A.O., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

566.   As described herein, Roblox Corp. knowingly conspired and otherwise acted in concert with Apple to violate the Florida Deceptive and Unfair Trade Practices Act ("FUDTPA"), to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

567.   In particular, Roblox Corp. and Apple knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from their harmful Roblox video game product, and that addicted and harmed A.O.

568.   As described herein, Apple conspired with and acted in concert with Roblox Corp. to distribute, market, supply, and/or sell Roblox and all in-game downloadable content and in-game purchases contained therein through the Apple Store App in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

569.   In particularly, Apple and Roblox Corp. knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from Roblox and all in-game downloadable products and in-game purchases made available that addicted and harmed A.O.

570.   Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including A.O., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

571.   Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including A.O.

572.   These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users, like Plaintiffs.

573.   Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

574.   Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

575.   The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, Plaintiffs continue to suffer injuries and damages as A.O. is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective product designs, and Defendants' failure to warn

consumers, like Plaintiffs, about the harmful and addictive qualities and components of those video game products.

## COUNT XII
## AIDING AND ABETTING
### (Against Both Defendants)

576.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

577.    Aiding and abetting arises where one party acts in concert with another tortfeasor.

578.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like A.O., with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by A.O. and other users.

579.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each Defendants to utilize the same patents to keep users, including minors like A.O., addicted to Defendants' products.

580.    More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like A.O., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

581.    Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

582.    Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth,

including A.O., arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

583.    Additionally, Apple acted in concert with Roblox Corp. to place addictive games and technology in its video game products and encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

584.    Apple does not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor, including A.O., can spend playing games.

585.    Each Defendant thus aided, abetted, and/or assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

586.    Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users, including Plaintiffs.

587.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

588.    Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

589.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products.

590.    As a proximate result of Defendants' conspiring to make their games addicting, A.O. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of A.O.'s addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products.

591.    Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused A.O.'s addiction and Plaintiffs' damages, as described herein.

592.    For these reasons, Defendants have shared liability for Plaintiffs' injuries and damages.

**COUNT XIII**
**RAMONA ORELLANA'S LOSS OF CONSORTIUM**
**(Against Both Defendants)**

593.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

594.    In Florida, a parent of an injured child may recover for the loss of companionship, society, love, affection, and solace as well as ordinary day-to-day services during the child's minority, expenses of treatment, and other damages based on a defendant's tortious conduct.

595.    As described herein, each Defendant has designed its video game products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm, engaged in intentional, deceptive, and unreasonable business practices in connection with Defendants' video game products, which injured Ramona Orellana's child, A.O.

596.    As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant, and by reason of the personal injuries sustained by A.O., Ramona Orellana has sustained damages—including great mental anguish and emotional distress—and may sustain such damages in the future by reason of A.O.'s injuries and a resulting loss of A.O.'s companionship, society, love, affection, and services.

## VII.    PRAYER FOR RELIEF

597.    Plaintiffs Ramona Orellana, individually and on behalf of A.O., a minor, respectfully request judgment in their favor and against each Defendants to the full extent of the law, as follows:

    a.  For an award of compensatory damages for A.O. in an amount to be determined at trial on the following elements of damage:

        i.  The nature, extent, duration, and permanency of A.O.'s injuries;

        ii.  The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

        iii.  The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

        iv.  The pain, suffering, and mental anguish experienced in the past;

        v.  The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

        vi.  The present value of any loss of ability to earn in the future;

        vii.  Any scars, disfigurement, and visible results of A.O.'s injuries;

        viii.  The reasonable expense of any necessary help in A.O.'s home which has been required as a result of A.O.'s injuries;

        ix.  The present value of any necessary help in A.O.'s home reasonably certain to be required in the future;

        x.  A.O.'s inability to attend school;

xi.   Actual financial loss; and

xii.  Any other actual pecuniary loss or future financial loss proximately caused by Defendants.

b.  For an award of compensatory damages for Ramona Orellana, in an amount to be determined at trial, to fairly compensate Ramona Orellana for pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services of A.O. resulting from the injuries to A.O. proximately caused by Defendants' tortious acts and misconduct described herein;

c.  For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

d.  For an award of statutory damages in an amount to be determined at trial;

e.  For an award of costs and attorneys' fees, as allowable by law;

f.  For pre-judgment and post-judgment interest, as allowable by law; and

g.  For such other and further relief as this Court may deem just and proper.

## VIII.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted, this 24th day of April, 2024.

**BULLOCK WARD MASON LLC**

*/s/ Andrew S. Bullock*
Andrew S. Bullock (FL55481)
3350 Riverwood Pkwy, Suite 1900
Atlanta, Georgia 30339
(833) 296-5291
(833) 895-2022 (facsimile)
andrew@bwmlaw.com

*Attorney for Plaintiffs Ramona Orellana,*
*individually and on behalf of A.O., a minor*
