UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RAMONA ORELLANA, individually,
and on behalf of A.O., a minor, N.O., a
minor, and J.O., a minor,

      Plaintiffs,

v.                                                    Case No: 6:24-cv-762-JSS-RMN

ROBLOX CORPORATION, APPLE
INC., SONY INTERACTIVE
ENTERTAINMENT LLC and EPIC
GAMES, INC.,

      Defendants.

_____/

## ORDER

Defendants Epic Games, Inc. and Sony Interactive Entertainment LLC move to compel arbitration and to stay this matter pending arbitration. (Dkts. 65, 76.) Plaintiffs oppose the motions. (Dkts. 94, 95.) For the reasons outlined below, the court grants Epic's motion and grants in part and denies in part Sony's motion.

## BACKGROUND

Plaintiff, Ramona Orellana, alleges that her minor children, A.O., N.O., and J.O., are addicted to playing video games. (Dkt. 32 ¶¶ 64, 67, 69, 71.) According to Orellana, her children's video game addictions developed from using Defendants' products and have caused her children to develop withdrawal symptoms, sleep deprivation, and aggression, among other injuries. (Id. ¶¶ 393, 400, 411.) Specifically,

Orellana asserts that N.O. and J.O. are addicted to playing Fortnite, a video game developed by Epic that is available through Sony's PlayStation Network on Sony's PlayStation 4 (PS4) and PlayStation 5 (PS5) video game consoles.[1]  (*Id.* ¶¶ 46, 57, 59, 397, 408.)   Orellana further asserts that A.O., N.O., and J.O. are addicted to playing Roblox, a video game developed by Defendant Roblox Corporation, that is available through Sony's PlayStation Network on Sony's PS4 and PS5 video game consoles and Defendant Apple Inc.'s App Store on its iPhone and iPad products.[2]  (Dkt. 32 ¶¶ 57, 59, 62, 67, 386, 397, 408.)  Orellana alleges that Sony and Apple "acted in concert" with each other and with Epic and Roblox "to distribute, market, supply, and/or sell" their respective games "and all in-game downloadable products and upgrades and in-game purchases contained therein." (*Id.* ¶¶ 44, 47, 59, 62, 350, 695.)

Based on these allegations, Orellana brings the following claims pursuant to the court's diversity jurisdiction against Defendants: strict liability - defective design (Count I), strict liability - failure to warn (Count II), negligent design (Count III), negligent failure to warn (Count IV), negligence (Count V), gross negligence (Count VI), intentional infliction of emotional distress (Count VII), negligent infliction of emotional distress (Count VIII), fraud (Count IX), negligent misrepresentation (Count X), civil conspiracy (Count XI), aiding and abetting (Count XII), and loss of consortium (Count XIII).  (*Id.* ¶¶ 73–74, 430–723.)

---

[1] Orellana does not allege that A.O. plays Fortnite. (*Compare* Dkt. 32 ¶ 386, *with* (Dkt. 32 ¶¶ 397, 408).)
[2] Plaintiffs initially brought claims against Microsoft Corporation and Mojang A.B. (Dkt. 32 ¶¶ 48–54.) On November 8, 2024, Plaintiffs voluntarily dismissed this action without prejudice against those Defendants.  (Dkt. 110.)

Epic moves to compel arbitration of N.O.'s and J.O.'s claims pursuant to the parties' agreement to the Fortnite End User License Agreement (EULA). (Dkt. 65. at 1.) Sony moves to compel arbitration of A.O.'s, N.O.'s, and J.O.'s claims pursuant to the parties' agreement to the PlayStation Network's Terms of Service and User Agreement (PSN TSUA). (Dkt. 76 at 2.) Epic and Sony further move to stay this case pending arbitration. (Dkt. 65 at 20–21; Dkt. 76 at 22–23.) Plaintiffs oppose arbitration and a stay of any nonarbitrable claims if the court compels A.O., N.O., and J.O. to arbitrate. (Dkts. 94, 95.)

## APPLICABLE STANDARDS

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, generally governs the validity and enforcement of arbitration agreements. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005). "The FAA's primary substantive provision provides that a written agreement to arbitrate a controversy arising out of that contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1329 (11th Cir. 2014) (quoting 9 U.S.C. § 2). Section 4 of the FAA grants district courts the authority to compel arbitration once the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not [a]n issue." 9 U.S.C. § 4. The FAA thus codifies a "strong federal preference for arbitration of disputes." *Musnick v. King Motor Co.*, 325 F.3d 1255, 1258 (11th Cir. 2003); *accord Collado v. J. & G. Transp.*, 820 F.3d 1256, 1259 (11th Cir. 2016) ("Federal policy strongly favors enforcing arbitration agreements."). In

doing so, the FAA places "arbitration agreements on an equal footing with other contracts . . . and requires courts to enforce them according to their terms." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citation omitted). Because arbitration "'is a matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1315 (11th Cir. 2002) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986), *overruled on other grounds by* 596 U.S. 411). Therefore, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

Courts should "treat motions to compel arbitration similarly to motions for summary judgment." *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1215 n.3 (11th Cir. 2021) (citing *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (concluding "that a summary judgment-like standard is appropriate and hold[ing] that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement")). Once the movant satisfies its initial burden of showing there is no genuine issue of material fact, then "the burden shifts to the nonmovant to show evidence raising a genuine issue of material fact." *Deal v. Tugalo Gas Inc.*, 991 F.3d 1313, 1325 (11th Cir. 2021). "A plaintiff challenging the enforcement of an arbitration agreement bears the burden to establish, by substantial evidence, any defense to the enforcement of the

agreement." *Inetianbor v. CashCall, Inc.*, 923 F. Supp. 2d 1358, 1362 (S.D. Fla. 2013) (citing *Bess v. Check Express,* 294 F.3d 1298, 1306–07 (11th Cir. 2002)). In determining whether to compel arbitration, district courts must view the facts in the light most favorable to the nonmovant. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

## ANALYSIS

The court will first discuss why Florida law governs the question of whether a valid contract was formed. Then, explain why N.O. and J.O. entered into valid agreements to arbitrate their claims with Epic and Sony. The discussion will then focus on how the delegation provisions evidence the parties' intent to have the arbitrator decide questions of arbitrability. Finally, the court will explain its decision to stay the case pending arbitration.

### A. Choice of Law

Orellana asserts that Florida law applies to resolve the motions. (*See* Dkts. 94, 95 (citing Florida law).) Epic maintains that the EULA is governed by North Carolina law. (Dkt. 65 at 5.) Sony maintains that the PSN TSUA is governed by California law. (Dkt. 76 at 12 (citing Dkt. 77-1 at 13–14).) However, Epic and Sony also assert that North Carolina and California laws do not conflict with Florida law on the issues raised in the motions. (Dkt. 65 at 5; Dkt. 76 at 12.) The court agrees with Epic and Sony and thus applies the substantive law of Florida as the forum state. *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 n. 21 (encouraging courts to "simply apply the

law of the forum state" when "there is no difference in the substantive law of the competing states" because doing so is "more streamlined and less time-consuming" than applying the law of each of the competing states).

A federal court sitting in diversity applies the choice of law rules of the forum state. *Rando v. Gov't. Emps. Ins. Co.*, 556 F.3d 1173, 1176 (11th Cir. 2009). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944, (1995) (collecting cases). This court has subject matter jurisdiction over the instant action based upon diversity of citizenship. *See* 28 U.S.C. § 1332(a)(3). Florida is the forum state of the instant action. Therefore, Florida substantive law applies. *First Options*, 514 U.S. at 943. "Because there is a threshold issue of whether [N.O. and J.O] assented to the [EULA and PSN TSUA t]erms, which includes the [North Carolina and California] choice of law clause[s] therein, Florida's law of contract formation applies to first determine the existence of a contract." *Valiente v. StockX, Inc.*, 645 F. Supp. 3d 1331, 1336–1337 (S.D. Fla. 2022); *accord Williams v. Gen. Elec.*, 13 F. Supp. 3d 1176, 1181 n.5 (N.D. Ala. 2014) ("[A] court cannot sensibly apply a contractual choice-of-law provision before the court determines that the parties have a valid contract.")

### B. Contract Formation

Epic and Sony maintain that J.O. and N.O. entered into valid arbitration agreements by agreeing to the EULA to play Fortnite and to the PSN TSUA to create PlayStation Network accounts to play video games on the PS4 or PS5. (Dkt. 65 at 12–15; Dkt. 76 at 10–15.) Sony further maintains that A.O. should be required to arbitrate as a third-party beneficiary to the valid agreements J.O. and N.O. entered into with Sony. (Dkt. 76 at 13–15.) Orellana alleges that all her children played video games on the PS4 or PS5, which requires a user to create a PlayStation Network account to play video games. (Dkt. 76 at 13 (citing Dkt. 32 ¶¶ 34–35, 67, 69, 71).) Orellana admits that N.O. and J.O. created PlayStation Network and Fortnite accounts. (Dkt. 94 at 10; Dkt. 95 at 9.) However, she asserts that "[b]ecause N.O. and J.O. created their [Sony and Epic] accounts as minors, they lacked [the] capacity to enter into a binding contract[,] and their agreements are voidable." (*Id.*) She further asserts that N.O. and J.O. disaffirmed such agreements by filing the initial complaint. (*Id.*)

The elements of a valid contract are "(1) offer[,] (2) acceptance[,] (3) consideration[,] and (4) sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)). A clickwrap agreement "occurs when a website directs a . . . user to the terms and conditions of the sale and requires the user to click a box to acknowledge that [the user has] read those terms and conditions. . . . [Such] agreements are generally enforceable." *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. Dist. Ct. App. 2022) (emphasis omitted); *see also Mason v. Midland*

*Funding LLC*, 815 F. App'x 320, 322 (11th Cir. 2020) (explaining that courts have "largely approved the use of clickwrap agreements" because [such agreements place] consumers "on notice that an agreement exists and [allow consumers] the opportunity to review the terms of th[e] agreement and to consent").

**1. Epic**

Epic's Product Management Director, David Saunders, submitted a declaration in support of Epic's motion. (Dkt. 66.) In that declaration, Saunders states that Epic identified two accounts associated with N.O. and J.O. created on March 10, 2018, and May 29, 2018. (*Id*. at 6–7.) According to Saunders, N.O. and J.O. accepted the terms of the EULA on those days. (*Id*. at 6–8.) At that time, the EULA did not include an arbitration provision. (*See* Dkt. 66-1.) However, the EULA included an amendment provision.[3] From March 2019 on, the EULA has included a binding arbitration agreement. (Dkt. 66 at 6 ("Following an update [of the EULA terms], players who log in to Fortnite are prompted with the updated EULA on-screen and must again affirmatively select the 'accept' button before they can continue playing Fortnite."); *see also* Dkts. 66-3, 66-4, 66-5.)

---

[3]According to the EULA,

> Epic may issue an amended Agreement at any time in its discretion by posting the amended Agreement on its website or by providing you with digital access to the amended Agreement when you next access the Software. If any amendment to this Agreement is not acceptable to you, you may terminate this Agreement and must stop using the Software. Your continued use of the Software will demonstrate your acceptance of the amended Agreement.

(Dkt. 66-1 at 7.)

Saunders maintains that N.O. and J.O. agreed and accepted the terms of each amended EULA as they were required to accept the amended EULA's terms to continue playing Fortnite. (Dkt. 66 at 8–11.) According to Epic's records, the accounts associated with N.O. and J.O. have been used to play Fortnite as recently as October 2024. (*Id.* at 7.)

The EULA is a clickwrap agreement that appears on a potential Fortnite player's screen after the Fortnite software is downloaded. (*Id.* at 3.) *See Massage Envy*, 339 So. 3d at 484; *see also Mason*, 815 F. App'x at 322. According to Saunders, potential players must scroll through the text and click a box indicating whether they "accept" or "decline" the EULA's terms by physically pressing their keyboard or video game console controller. (Dkt. 66 at 3.) To play Fortnite, a potential player must accept the EULA's terms. (*Id.*)

Since March 2019, the following notice has appeared on the first page of the EULA:

> You and Epic agree to resolve disputes between us in individual arbitration (not in court). We believe the alternative dispute-resolution process of arbitration will resolve any dispute fairly and more quickly and efficiently than formal court litigation. Section 12 explains the process in detail. We've put this up front (and in caps) because it's important:
>
> **THIS AGREEMENT CONTAINS A BINDING INDIVIDUAL ARBITRATION AND CLASS-ACTION WAIVER PROVISION. IF YOU ACCEPT THIS AGREEMENT, YOU AND EPIC AGREE TO RESOLVE DISPUTES IN BINDING, INDIVIDUAL ARBITRATION AND GIVE UP THE RIGHT TO GO**

- 9 -

**TO COURT INDIVIDUALLY OR AS PART OF A CLASS ACTION, AND EPIC AGREES TO PAY YOUR ARBITRATION COSTS FOR ALL DISPUTES OF UP TO $10,000 THAT ARE MADE IN GOOD FAITH (SEE SECTION 12). YOU HAVE A TIME-LIMITED RIGHT TO OPT OUT OF THIS WAIVER.**

(Dkt. 66-3 at 2; Dkt. 66-4 at 2; Dkt. 66-5 at 2.)  Section 12 of the EULA contains the

full arbitration agreement, which states in relevant part:

> You and Epic agree to submit all Disputes between You and Epic to individual binding arbitration. "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between You and Epic that relates to your use or attempted use of Epic's products or services and Epic's products and services generally, including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section.
>
> You and Epic agree to arbitrate all Disputes regardless of whether the Dispute is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory. . . . You and Epic agree that whether a dispute is subject to arbitration under this Agreement will be determined by the arbitrator rather than a court.[4]

---

[4] According to the EULA, the arbitration agreement does not apply to

> (1) individual actions in small-claims court[,] (2) pursuit of enforcement actions through a government agency if the law allows[,] (3) a complaint or remedy under the EU General Data Protection Regulation[,] (4) an action to compel or uphold any prior arbitration decision[,] (5) Epic's right to seek injunctive relief against You in a court of law to preserve the status quo while an arbitration proceeds[,] (6) claims of piracy, creation, distribution, or promotion of Cheats, and intellectual-property infringement, and (7) the enforceability of the Class Action Waiver clause below.

(Dkt. 66-3 at 12; Dkt. 66-4 at 12; Dkt. 66-5 at 12.)

(Dkt. 66-3 at 11–12; Dkt. 66-4 at 11–12; Dkt. 66-5 at 11–12.)  The EULA also contains

an arbitration opt-out provision.  (Dkt. 66-3 at 14; Dkt. 66-4 at 14; Dkt. 66-5 at 14.)

Orellana does not dispute that N.O. and J.O. accepted the terms of the EULA

and created accounts to play Fortnite.  (*See* Dkt. 95 at 4 ("N.O. began playing Fortnite

at age nine [] and J.O. began playing at age seven []." (citing Dkt. 32 ¶¶ 397, 408)).)

She also does not dispute that N.O. and J.O. accepted the terms of each amended

EULA and have continued to play Fortnite.  (*Id.* at 9 ("To the extent N.O. and J.O.

continue to use Epic video game products, they do so now as a result of their

disordered compulsion and addiction to using the products." (citing Dkt. 32 ¶ 151)).)

According to Saunders, N.O. and J.O. did not opt out of the arbitration agreement

within the time set forth to do so.  (Dkt. 66 at 9, 11.)  "By declining to opt out in

accordance with the terms of the offer, [N.O. and J.O.] accepted [Epic's] offer to

resolve any disputes through arbitration."  *See Dorward v. Macy's Inc.*, No. 2:10-cv-669-

FtM-29DNF, 2011 WL 2893118, at *10 (M.D. Fla. July 20, 2011).

Notice of the arbitration provision is prominently displayed in bold capital

letters on the first page of the EULA.  (Dkt. 66-3 at 12; Dkt. 66-4 at 12; Dkt. 66-5 at

2.)  The arbitration agreement represented Epic's offer to submit to arbitration any

dispute arising from the use of Epic's products, with a few narrowly tailored exceptions

that are not applicable here.  (*Id.* at 11–12.)  N.O. and J.O. accepted this offer by

clicking accept each time the EULA was amended and by continuing to play Fortnite.

There is valid consideration for the arbitration agreement because the parties mutually

waived their right to suit in favor of arbitration.  *See Lemmon v. Lincoln Prop. Co.*, 307

F. Supp. 2d 1352, 1355 (M.D. Fla. 2004) (finding that an arbitration agreement was supported by consideration based on the mutuality of the parties' obligations to arbitrate); *Tranchant v. Ritz Carlton Hotel Co.*, No. 2:10-CV-233-FTM-29, 2011 WL 1230734, at *4 (M.D. Fla. Mar. 31, 2011) ("In Florida, one party's promise to submit its claims to arbitration typically provides sufficient consideration to support the other party's promise to submit its claims to arbitration.").   The parties do not dispute that the EULA contains sufficient specification of the essential terms.  (Dkts. 65, 95.)  A review of the EULA confirms that the essential terms are sufficiently specified. (Dkts. 66-1, 66-2, 66-3, 66-4, 66-5.) *Vega*, 564 F.3d at 1272.

Orellana argues that N.O. and J.O. lacked the capacity to enter into a binding contract, and their "agreements are voidable" because they were minors at the time of contracting.  (Dkt. 95 at 9.)  "[C]ontracts entered into by minors are voidable" on the basis of infancy.  *Off the Wall & Gameroom LLC v. Gabbai*, 301 So. 3d 281, 284 (Fla. Dist. Ct. App. 2020) (citing *Mossler Acceptance Co. v. Perlman*, 47 So. 2d 296, 298 (Fla. 1950)).  However, infancy is a defense to enforceability and does not relate to contract formation.  *Mossler*, 47 So. 2d at 298 (recognizing infancy as a defense to enforceability).  As such, whether N.O.'s and J.O.'s agreements with Epic are void due to their infancy is for the arbitrator, not the court, to decide, as explained in further detail below.  *See Ayers v. Epic Games*, *Inc.*, No. 1:24-cv-64-AW-MJF, Dkt. 162 at 6 (N.D. Fla. Jan. 27, 2025) (explaining that although "counsel argued that O.A.'s minority, combined with the alleged gaming addiction, left O.A. incapable of agreeing to any amendment[,] . . . [u]nder Florida law, both minority and duress are defenses

to contract enforceability. . . and not issues related to formation"); *cf. Angelilli v. Activision Blizzard, Inc.*, No. 23-cv-16566, 2025 WL 524276, at *6 (N.D. Ill. Feb. 18, 2025) ([The p]laintiffs also assert that no contract was formed . . . because D.G. was a minor and therefore lacked capacity to legally accept. The problem with this argument is that youth does not prevent contract formation under Illinois law."); *Courtright v. Epic Games, Inc.*, No. 2:24-CV-04055-BCW, 2025 WL 558560, at *5 (W.D. Mo. Feb. 13, 2025) ("As admitted by [the p]laintiff, [under Missouri law,] lack of capacity due to minority status does not render a contract absolutely void, but simply voidable."); *Dunn v. Activision Blizzard, Inc.*, No. 3:23CV00224 JM, 2024 WL 4652194, at *4 (E.D. Ark. Oct. 31, 2024) ("Because G.D.'s contract is voidable, not void under Arkansas law, G.D.'s infancy and alleged lack of competency do not nullify his agreement. Further, because of the EULA's broad delegation clause, the plaintiffs' contract enforceability challenges[,] including the . . . disaffirmation of the agreement[,] go to an arbitrator.")

Thus, N.O. and J.O. entered into a valid written agreement to arbitrate their claims with Epic. *See Massage Envy*, 339 So. 3d at 485 (reversing the denial of a motion to compel arbitration explaining that the clickwrap agreement that contained the arbitration provision was enforceable because it put the plaintiff "on conspicuous notice on its first page of the provision binding her to arbitrate any disputes with [the defendant]"); *MetroPCS Commc'ns v. Porter*, 273 So. 3d 1025, 1028–29 (Fla. Dist. Ct. App. 2018) (concluding that providing a hyperlink to the terms and conditions at the end of short text messages to a customer was sufficient to put the customer on inquiry

notice of the arbitration provision contained in the terms and conditions); *cf. Antonetti v. Activision Blizzard, Inc.*, No. 1:24-CV-2019-TWT, 2025 WL 359323, at *5–7 (N.D. Ga. Jan. 31, 2025) (concluding that the plaintiff, who was a minor at the time he signed the EULA, entered into a valid agreement to arbitrate with Epic by accepting the EULA).

### 2. Sony

Sony's Senior Director of Product Management, Ryan King, submitted a declaration in support of Sony's motion. (Dkt. 77.) In that declaration, King states that Sony identified three accounts associated with Orellana's children. Two accounts were created on March 9, 2018, and the other on May 29, 2018. (*Id.* at 7–8.) Sony believes that J.O. and N.O. created these accounts. (Dkt. 76 at 13–14.) Sony maintains that it does not matter who created the accounts—Orellana, J.O., N.O., or A.O.—because the children have undisputedly used the accounts. (*Id.*) In Sony's view, even if A.O. did not create an account, A.O. should be bound by the arbitration agreements J.O. and N.O. assented to as a third-party user of N.O.'s or J.O.'s PlayStation Network account because Orellana alleges that A.O. uses Sony's products. (*Id.* at 14.) *See* Dkt. 32 ¶ 387 ("A.O. uses . . . Defendants' video gaming products on multiple devices, and through multiple systems . . . including the . . . PS4, and has also used . . . Defendants' video gaming products via in-store purchases, free and paid subscriptions upon purchase of gaming consoles[,] and . . . subscri[ptions] to PlayStation Premium . . . [and] as PlayStation's cloud gaming network . . . ." (emphasis omitted)).)

- 14 -

According to King, Sony's PlayStation Network "is a digital entertainment network that offers several services, including online gaming services and an online marketplace called the PlayStation Store." (Dkt. 77 at 2 ) (cleaned up). Sony also offers PlayStation Plus, which is "a premium subscription service for enhanced gaming and social features." (*Id*.) Access to the PlayStation Network is governed by the PSN TSUA. (*Id*.) Potential users must accept the terms of the PSN TSUA to create a PlayStation Network account. (*Id*.)

The PSN TSUA is a clickwrap agreement. *See Massage Envy*, 339 So. 3d at 484; *see also Mason*, 815 F. App'x at 322. According to King, when a potential user wants to create a PlayStation Network account on the PS4, the full text of the PSN TSUA appears on-screen in a scroll box. (Dkt. 77 at 2.) The potential user is then instructed to review the PSN TSUA before agreeing to it by clicking an on-screen "Accept" button. (*Id*. at 2–3.) When a potential user wants to create a PlayStation Network account on the PS5, a screen titled Important Legal Documents appears. (*Id*. at 3.) This screen instructs the potential user to "[r]ead each document carefully." (*Id*.) The screen also states that the PSN TSUA "explain[] the rules that apply to creation and use of an account for [PlayStation Network].") (*Id*.)

A link to the full text of the PSN TSUA also appears on the Important Legal Documents screen. (*Id.* at 4.) Once a potential user clicks on the link, the full text of the PSN TSUA is presented on-screen in a scroll box. (*Id*.) To proceed with signing up for a PlayStation Network account, the potential user must accept the terms of the

PSN TSUA by checking the "I Agree" box on the screen. (*Id.* at 5.) Once "I Agree" is selected, the following text appears: "By selecting [I Agree], you're confirming that you've understood and accepted the terms of service and the user agreement, and that the information you've provided is accurate." (*Id.*) King declares that the PSN TSUA is amended "[f]rom time to time." (*Id.*) King further declares that for certain updates, "users are prevented from accessing [the PlayStation Network] services . . . and must again agree and accept the [PSN TSUA] [t]erms to continue to maintain access to their account." (*Id.* at 5–6.)

King asserts that since the first account associated with N.O. and J.O. was created, the PSN TSUA has been amended eight times: in April 2018, July 2018, September 2018, April 2019, October 2020, May 2021, October 2022, and August 2023. (*Id.* at 6.) King further asserts that each of these amended versions of the PSN TSUA and the version Orellana's children would have signed when they created their accounts contained the applicable arbitration agreement. (*Id.*; *see also* Dkt. 77-1 at 13; Dkt. 77-2 at 19–20 (a copy of the PSN TSUA effective March 9, 2018); Dkt. 77-3 at 17–18 (a copy of the PSN TSUA effective May 29, 2018).)

Since August 2023, the first page of the PSN TSUA states:

> PLEASE CAREFULLY READ THE BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER IN SECTION 14. IT AFFECTS HOW DISPUTES ARE RESOLVED BETWEEN YOU AND [Sony Interactive Entertainment (SIE)] (AND ITS CURRENT OR FORMER AFFILIATES, PARENTS, OR SUBSIDIARIES) AND INFORMS YOU OF YOUR OPT-OUT RIGHTS.

(Dkt. 77-1 at 2.)  Section 14 of the PSN TSUA contains the full arbitration agreement,

which includes the following provisions:

> The term "Dispute" means any dispute, claim, or
> controversy between you and Sony Interactive
> Entertainment LLC . . . regarding PSN or PSN Content, or
> the use of any PlayStation Devices or other devices sold by
> a Sony Entity to access PSN Content, whether based in
> contract, statute, regulation, ordinance, tort (including
> fraud, misrepresentation, fraudulent inducement, or
> negligence), or any other legal or equitable theory, and
> includes the validity, enforceability or scope of this
> "BINDING INDIVIDUAL ARBITRATION" section
> (with the exception of the enforceability of the Class Action
> Waiver clause below). "Dispute" is to be given the broadest
> possible meaning that will be enforced. If you have a
> Dispute with any Sony Entity . . . that cannot be resolved
> through negotiation within the time frame described in the
> "Notice of Dispute" clause below, you and the Sony Entity
> that you have a Dispute with agree to seek resolution of the
> Dispute only through arbitration of that Dispute in
> accordance with the terms of this section, and not litigate
> any Dispute in court, except for those matters listed in the
> Exclusions from Arbitration clause.[5] Arbitration means that
> the Dispute will be resolved by a neutral arbitrator instead
> of in a court by a judge or jury.

(*Id.* at 13.)  The August 2023 PSN TSUA and the versions signed by Orellana's

children when they originally created their accounts also contained an arbitration opt-

out provision.  (Dkt. 77-1 at 13; Dkt. 77-2 at 19–20; Dkt. 77-3 at 18.)

According to King, the three accounts associated with Orellana's children

accepted the PSN TSUA on the dates the accounts were created.  (Dkt. 77 at 7–9.)

King states that two of the accounts accepted the August 2023 version of the PSN

---

[5] According to the PSN TSUA, the arbitration agreement does not apply to any claim filed in small claims court.
(Dkt. 77-1 at 13.)

- 17 -

TSUA terms on August 24, 2023, and the other account accepted on November 11,
2023. (*Id.*) King further states that two accounts have been used to play video games
as recently as September 2024. (*Id.* at 8–9.) Orellana does not dispute King's
assertions. (Dkt. 94 at 10) ("Because N.O. and J.O. created their Sony accounts as
minors, they lacked [the] capacity to enter into a binding contract and their agreements
are voidable . . . To the extent N.O. and J.O. continue to use Sony video game
products, they do so now as a result of their disordered compulsion and addiction to
using the products." (citing Dkt. 32 ¶¶ 150–52).) According to King, no user of the
accounts at issue opted out of the arbitration agreement within the time set forth to do
so. (Dkt. 77 at 9.) Accordingly, "[b]y declining to opt out in accordance with the
terms of the offer, [N.O. and J.O.] accepted [Sony's] offer to resolve any disputes
through arbitration." *Droward*, 2011 WL 2893118, at *10.

Notice of the arbitration provision is prominently displayed in capital letters on
the first page of the PSN TSUA. (Dkt. 77-1 at 2.) The arbitration agreement
represented Sony's offer to submit any dispute arising from the use of Sony's products,
other than disputes in small claims court, to arbitration. (Dkt. 77-1 at 13; *see also* Dkt.
77-2 at 19; Dkt. 77-3 at 17.) N.O. and J.O. accepted this offer by clicking "Accept" or
"I Agree" when they originally created their accounts, by accepting the terms again
when the PSN TSUA was amended, and by continuing to use Sony's products. There
is valid consideration for the agreement because the parties mutually waived their right
to sue in favor of arbitration. *See Lemmon*, 307 F. Supp. 2d at 1355; *Tranchant*, 2011
WL 1230734, at *4. The parties do not dispute that the PSN TSUA contains sufficient

specification of the essential terms.  (Dkts. 76, 94.)   A review of the PSN TSUA
confirms that the essential terms are sufficiently specified. (Dkts. 77-1, 77-2, 77-3.)
*Vega*, 564 F.3d at 1272.  Orellana maintains that N.O. and J.O. lacked the capacity to
agree to the PSN TSUA because they were minors at the time of contracting.  (Dkt.
94 at 10.)  The court has already determined that the arbitrator must decide whether
N.O.'s and J.O.'s agreements with Sony are void due to their infancy.  *See Ayers*, No.
1:24-cv-64-AW-MJF, Dkt. 162 at 7; *accord Angelilli*, 2025 WL 524276, at *6; *Courtright*,
2025 WL 558560, at *5; *Dunn*, 2024 WL 4652194, at *4.  Thus, N.O. and J.O. entered
into a valid written agreement to arbitrate their claims with Sony.  *See Massage Envy*,
339 So. 3d at 485; *MetroPCS Commc'ns*, 273 So. 3d at 1028–29; *cf. Antonetti*, 2025 WL
359323, at *5–7.

Sony does not contend that A.O. signed the PSN TSUA.  (*See* Dkt. 76.)  Instead,
Sony maintains that A.O., as a third-party user of N.O.'s or J.O.'s account or both
accounts, should be bound by equitable estoppel to arbitrate pursuant to the PSN
TSUA. (Dkt. 76 at 14–15.)  Orellana responds that N.O.'s and J.O.'s agreements with
Sony are voided by disaffirmance. (Dkt. 94 at 10.)  Whether J.O. and N.O. disaffirmed
their contracts is a question for the arbitrator, as explained below.  Orellana concedes
that A.O. uses Sony's products.  (Dkt. 32 ¶ 387.)  However, Sony has not persuaded
the court that equitable estoppel applies to bind A.O. as a non-signatory to the PSN
TSUA.

Under Florida law, "a non-signatory [of a contract] may be bound to arbitrate
under certain circumstances . . . [including] estoppel." *Allied Pros. Ins. Co., v. Fitzpatrick*,

- 19 -

169 So. 3d 138 (Fla. Dist. Ct. App. 2015) (citing *Johnson v. Pires*, 968 So. 2d 700, 701
(Fla. Dist. Ct. App. 2007)). "In the arbitration context, equitable estoppel provides
that '[a] party [to a lawsuit] may not rely on a contract to establish [their] claims while
avoiding [their] obligation under the contract to arbitrate such claims.'" *Paquin v.
Campbell*, 378 So. 3d 686, 690 (Fla. Dist. Ct. App. 2024) (quoting *BDO Seidman, LLP
v. Bee*, 970 So. 2d 869, 875 (Fla. Dist. Ct. App. 2007)). "Equitable estoppel binds a
non-signatory to a contract to arbitration in two situations." 378 So. 3d at 690.

"First, if a nonsignatory sues a signatory to a contract for breach of contract, the
nonsignatory is estopped from denying the arbitration clause in the contract." *Id.*
A.O. cannot be compelled to arbitrate under this rule because they did not sue Sony
"for breach or enforcement of the contracts containing the arbitration provision[];
[A.O.] sued in tort for negligence [and other claims] . . . based on common law
elements . . . ." *Id.* at 691. "Second, a nonsignatory to a contract will be estopped from
denying an arbitration provision in the contract when the nonsignatory has directly
benefitted from the contract." *Id.* "Direct benefits are benefits 'flowing directly form
the agreement.'" *Id.* (quoting *Taylor Grp., Inc. v. Indus. Distribs. Int'l Co.*, 859 F. App'x
439, 447 (11th Cir. 2021)). In contrast, indirect benefits from a contract, which are
insufficient to compel a nonsignatory to arbitrate, are those "where the nonsignatory
exploits the contractual relation[ship] of parties to an agreement, but does not exploit
(and thereby assume) the agreement itself." *Taylor*, 859 F. App'x at 447 (quoting *MAG
Portfolio Consult, GMBH v. Merlin Biomed Grp.*, 268 F.3d 58, 61 (2d Cir. 2001)). Sony

- 20 -

does not argue or provide the court with any binding legal authority that supports the contention that A.O. directly benefitted from the PSN TSUA. (*See* Dkt. 76 at 10–15.)

Thus, A.O., as a non-signatory to the PSN TSUA, cannot be compelled to arbitrate based on equitable estoppel. *See Paquin*, 378 So. 3d at 691 (explaining that it is insufficient for the party seeking to compel arbitration to rely only on the relationship between the non-signatory and the signatory to compel arbitration under equitable estoppel).

## C. Delegation

Orellana contends that the court should not compel arbitration because (1) J.O. and N.O. disaffirmed the EULA and PSN TSUA by filing the complaint, (2) the EULA and PSN TSUA are voidable because N.O. and J.O. were minors when they signed them, (3) the arbitration agreements contained in the EULA and PSN TSUA are unconscionable, and (4) A.O.'s, N.O.'s, and J.O.'s claims arise out of video game addiction and therefore fall outside the scope of the arbitration agreements. (Dkt. 94 at 10–19; Dkt. 95 at 9–18.) Epic and Sony assert that if the court determines the agreements to arbitrate are valid, the case should proceed to arbitration. (Dkt. 65 at 15–17; Dkt. 76 at 15–19.) Epic and Sony reason that the EULA and PSN TSUA include delegation provisions that expressly delegate questions about the enforceability, scope, and applicability of the parties' arbitration agreements to the arbitrator. (Dkt. 65 at 15–17; Dkt. 76 at 15–19.)

"[T]he question of arbitrability . . . is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the

- 21 -

question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986); *accord JPay, Inc. v. Kobel*, 904 F.3d 923, 929–30 (11th Cir. 2018). "[W]here an arbitration agreement contains a delegation provision—committing to the arbitrator the threshold determination of whether the agreement to arbitrate is enforceable—the courts only retain jurisdiction to review a challenge to that specific provision." *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144 (11th Cir. 2015) (citing *Rent-A-Center*, 561 U.S. at 72). "A party specifically challenges the validity or enforceability of a delegation agreement if, and only if, the substantive nature of the party's challenge meaningfully goes to the parties' precise agreement to delegate threshold arbitrability issues." *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1304 (11th Cir. 2022). "Absent such a challenge," courts must "treat a delegation provision as valid and permit the parties to proceed to arbitration." *Parnell*, 804 F.3d at 1144 (citing *Rent-A-Center*, 561 U.S. at 71–72). Thus, the court "may examine a challenge to a delegation provision only if the [plaintiff] 'challenge[s] the delegation provision directly.'" *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (quoting *Parnell*, 804 F.3d at 1144.)

Orellana challenges the enforceability of the entire EULA and PSN TSUA and the scope of the arbitration agreements contained therein but does not directly challenge the delegation provisions. (*See* Dkts. 94, 95.) Orellana mentions the EULA delegation provision in her opposition to Epic's motion only once, in the section titled The Arbitration Clause Cannot be Enforced Because It Is Unconscionable. (Dkt. 95 at 18 ("Accordingly, the delegation and arbitration clause[s] in the Agreements are

- 22 -

unenforceable.").)  Likewise, she mentions the PSN TSUA delegation provision in her
opposition to Sony's motion a few more times in a section with the same title.  (Dkt.
94 at 13, 18–19).  It is insufficient for Orellana to challenge the delegation provisions
by alleging the unconscionability of the entire arbitration agreements.  *See Rent-A-
Center*, 561 U.S. at 73–74; *Parnell*, 804 F.3d at 1148–49; *Attix*, 35 F. 4th at 1304.  The
court "need not consider th[e] [unconscionability] claim because none of [Orellana's]
. . . unconscionability challenges [was] specific to the delegation provision[s]."  *See*
561 U.S. at 73; *see also Ayers*, No. 1:24-cv-64-AW-MJF, Dkt. 162 at 8 (concluding that
the plaintiff's unconscionability argument was for the arbitrator to decide because the
plaintiff did not properly raise a challenge to the delegation provision contained in the
EULA when the plaintiff alleged "that the delegation provision [was] unconscionable
for the same reasons the contract [was]"); *Antonetti*, 2025 WL 359323, at *8
(concluding that the plaintiff's "infancy, capacity, disaffirmance, and
unconscionability arguments" had to go to the arbitrator because none of the
arguments "specifically challenge[d] the delegation provision's validity or
enforceability apart from the contract's validity or enforceability as a whole").

Epic's EULA states: "You and Epic agree that whether a dispute is subject to
arbitration under this Agreement will be determined by the arbitrator rather than a
court."  (Dkt. 66-3 at 12; Dkt, 66-4 at 12; Dkt. 66-5 at 12.)  The EULA further states
that "'Dispute' means any dispute . . . including without limitation the validity,
enforceability, or scope of this Binding Individual Arbitration Section."  (Dkt. 66-3 at
12; Dkt, 66-4 at 12; Dkt. 66-5 at 12.)  Sony's PSN TSUA states: "'Dispute' means any

dispute, claim, or controversy between you and Sony Interactive Entertainment LLC . . . and includes the validity, enforceability or scope of this 'BINDING INDIVIDUAL ARBITRATION' section . . . . 'Dispute' is to be given the broadest possible meaning that will be enforced."  (Dkt. 77-1 at 13.)

Both delegation provisions clearly and unmistakably evince the parties' intent to arbitrate all gateway issues because both agreements require arbitration of any dispute.  *See Attix*, 35 F. 4th at 1297 ("By committing issues about 'what is subject to arbitration' to an arbitrator's review, the provision clearly and unmistakably sends threshold arbitrability disputes to an arbitrator instead of a court."); *Jones*, 866 F.3d at 1267 (explaining that provisions that require arbitration of any disputes mean all disputes, including all gateway issues of arbitrability).  Additionally, the PSN TSUA incorporates the American Arbitration Association rules.  (Dkt. 77-1 at 13.)  The incorporation of the American Arbitration Association rules in an arbitration agreement clearly and unmistakably delegates arbitrability to the arbitrator.  *See Attix*, 35 F. 4th at 1298 ("[A]n 'incorporation of [the American Arbitration Association's] rules giving an arbitrator the power to rule on his or her own jurisdiction constitutes a clear and unmistakable delegation of questions of arbitrability.'") (quoting *JPay*, 904 F.3d at 937–39); *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (explaining that by incorporating identical language in the American Arbitration Association's rules for commercial arbitrations into their agreement, "the parties clearly and unmistakably agreed that the arbitrator should decide whether the

arbitration clause is valid").  Therefore, the court sends N.O.'s and J.O.'s claims to arbitration for the arbitrator to decide their related enforceability and scope arguments.

### D. Stay

Epic and Sony maintain that the court should stay the nonarbitrable claims in this case because they are intertwined with arbitrable claims.  (Dkt. 65 at 20–21; Dkt. 76 at 22–23.)  Sony further maintains that the court should stay Plaintiffs claims against Apple and Roblox to avoid the risk of conflicting outcomes because all their claims present the same legal and factual issues.  (Dkt. 76 at 23.)  Orellana maintains that a stay pending arbitration is unnecessary.  (Dkt. 94 at 19–20; Dkt. 95 at 18–19.)  Epic and Sony cite legal authority in support of its motions to stay the case.  (Dkts. 65, 76.)  Orellana does not cite any legal authority in support of her position.  (Dkts. 94, 95.)  Accordingly, her position is not persuasive.  *See generally N.L.R.B. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

In any event, section 3 of the FAA requires district courts to stay "any suit or proceeding . . . upon being satisfied that [an] issue involved in [the] suit or proceeding is referable to arbitration . . . until [the] arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, [section] 3 of the FAA compels the court to stay the proceeding."  *Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024).  "When confronted with litigants advancing both arbitrable and

- 25 -

nonarbitrable claims . . . courts have discretion to stay nonarbitrable claims." *See Klay v. All Defendant*s, 389 F.3d 1191, 1204 (11th Cir. 2004). "Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Id.*

The nonarbitrable claims against Epic and Sony will be stayed because they are dependent upon the arbitrator's decision regarding the arbitrable claims. *See id*. All of the nonarbitrable claims against Apple and Roblox will be stayed in the interest of judicial economy because they are based on similar factual allegations. Orellana alleges that Sony and Apple "acted in concert" with Epic and Roblox "to distribute, market, supply, and/or sell" their respective games "and all in-game downloadable products and upgrades and in-game purchases contained therein." (*Id.* ¶¶ 44, 47, 59, 62, 350, 695.) Therefore, a stay of this matter will avoid inconsistent rulings and confusion in parallel proceedings. *See, e.g.*, *Variable Annuity Life Ins. Co. v. Laferrera*, 680 F. App'x 880, 884–885 (11th Cir. 2017) (finding that the district court abused its discretion in refusing to stay non-arbitrable claims that were based on "the exact same factual allegations" as the arbitrable claims because the defendant would have "to defend identical claims in two separate forums" which would "give rise to the possibility of inconsistent results"); *Johnson v. Expert, Inc.*, No. 8:23-cv-2980-CEH-CPT, 2024 WL 4045654, at *3 (M.D. Fla. Aug. 5, 2024) (staying nonarbitrable claims when "the arbitrable and nonarbitrable claims [were] closely intertwined"); *Anderson v. Goodleap, LLC*, No. 8:23-cv-02366-WFJ-TGW, 2024 WL 1095934, at *1 (M.D. Fla. Mar. 13, 2024) (staying nonarbitrable claims because they "share[d] underlying facts

- 26 -

and legal issues" with arbitrable claims and because "proceeding concurrently with litigation and arbitration could [have] result[ed] in inconsistent determinations").

<b>CONCLUSION</b>

Accordingly:

1.  Defendant Epic Games, Inc.'s Motion to Compel Arbitration and Stay Proceedings (Dkt. 65) is **GRANTED**.

2. J.O. and N.O. **SHALL** arbitrate their claims against Defendant Epic Games, Inc.

3. Defendant Sony Interactive Entertainment LLC's Motion to Compel Arbitration (Dkt. 76) is **GRANTED in part and DENIED in part**.

4. J.O. and N.O. **SHALL** arbitrate their claims against Defendant Sony Interactive Entertainment LLC.

5. The parties **SHALL** file a joint status report no later than five days after the arbitrations reach their final outcomes.

6. Epic's and Sony's Unopposed Motion to Stay Discovery Pending Resolution of Motions to Compel Arbitration (Dkt. 131) is **DENIED as moot**.

7. This case is **STAYED** pending the completion of the arbitration proceedings.

8. All pending motions (Dkts. 41, 74, 78, 132) are **DENIED without prejudice** and may be re-filed after the stay is lifted, if appropriate.

9. The Clerk is **DIRECTED** to terminate any deadlines and administratively close this case.

**ORDERED** in Orlando, Florida, on March 4, 2025.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record